**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| KELLY BLAND, an individual, on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INVIDA FINANCIAL NETWORK LLC, an Virginia limited liability company, and BRYLORENCE INVESTMENTS, LLC, a Texas limited liability company<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 3:26-cv-00259 |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Kelly Bland ("Bland" or "Plaintiff") bring this class action complaint against Defendants InVida Financial Network LLC ("InVida"), Brylorence Investments, LLC ("Brylorence"), and others (collectively, "Defendants") to stop Defendants' practice of making unsolicited telemarketing calls to telephone numbers listed on the national Do-No-Call Registry, using false outgoing telephone numbers ("spoofed" telephone numbers), and to obtain redress for all persons injured by this conduct. Plaintiff, for her class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### <u>Nature of the Case</u>

1. Plaintiff, individually and as proposed class representative for all others similarly situated, brings this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA") for unsolicited, "spoofed" telemarketing calls

made by or on behalf of Defendants.

2. Plaintiff, individually, and for class members (together, "Plaintiffs"), seeks an injunction and other equitable relief, and an award of statutory damages, and costs and reasonable attorneys' fees, to the members of the proposed classes.

**Parties**

3. Plaintiff Kelly Bland is a resident of Texas. She is the subscriber of a residential telephone listed on the national Do Not Call list consistent with, on which she received numerous unsolicited telephone calls from Defendants.

4. On information and belief, Defendant InVida Financial Network LLC ("InVida") is a Virginia limited liability company, which lists its address with the Virginia Secretary of State as 3325 US Highway 29, Suite A, Danville, Virginia 24540. InVida is an insurance sales group that offers insurance and other financial products. The company was founded by Philip Hudgins in 2007 and is headquartered in Danville, Virginia. InVida is licensed to operate in all states except New York.

5. On information and belief, Defendant Brylorence Investments, LLC ("Brylorence") is a Texas limited liability company which lists its address with the Texas Secretary of State as 21219 Barton Hollow Lane, Richmond, Texas 77407. Brylorence operates as an insurance brokerage under InVida's authority.

**Jurisdiction and Venue**

6. **Subject Matter:** This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S.

368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

7. This Court has personal jurisdiction over the Defendants under Texas Civil Practice & Remedies Code § 17.042 because Defendants committed a tort in this state by directing their telemarketing to residents of Texas, including Plaintiff.

8. Furthermore, Defendants knowingly and purposefully availed themselves to the State of Texas when they caused phone calls to be made to Plaintiff's phone with an "817" area code, which is associated with the State of Texas.

9. **Venue:** Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District.

10. **Intradistrict Assignment:** Assignment to the Court's Dallas division is proper, because when Bland received Defendants' calls, she lived in Irving, in Dallas County, and a substantial part of the events giving rise to her claims occurred in the Dallas division.

## The Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227

11. "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020). In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices. Pub. L. No. 102-243, (Dec. 20, 1991), *codified at* 47 U.S.C. § 227. *See also Mims*, 565 U.S. at 371 ("The Act bans certain practices invasive of privacy").

12. The TCPA (via its implementing FCC regulations) prohibit calls to any number that is registered with the National Do-Not-Call Registry. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). The TCPA provides a private right of action for damages and injunctive relief for

such DNC violations. 47 U.S.C. § 227(c)(5).

13. The National Do-Not-Call Registry allows residential telephone subscribers to register their telephone numbers with the Registry to indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing of the Registry "must be honored indefinitely or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

14. Defendants are liable under the TCPA. The FCC's regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397, ¶13 (1995). The FCC reiterated this principle in 2013, when it explained that "a seller . . . may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013). "Vicarious liability under the TCPA is governed by the federal common law of agency." *Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 743 (W.D. Tex. 2023). *Cf. id.* at 746 (describing TCPA liability for ratification, where Defendants "knowingly accepted the benefits that flowed from the call campaign in the form of increased business"). *See also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) ("no cause to question" precept that "under federal common-law principles of agency, there is vicarious liability for TCPA violations"); Restatement (Third) of Agency (2006) §§ 2.01, 2.03, 4.01 (vicarious liability "may be established by express authorization, implicit authorization, or ratification").

15. The TCPA reflects Congress's intent to preserve the social norms that Americans answer calls to their telephone numbers. Abusive and deceptive robocalls like those used by

Defendants are a scourge on modern society, and represent an increasing threat to American's continued use of the telephone system, which relies on the custom that people generally answer telephone calls to their telephone number. The TCPA's legislative history recognized the continued proliferation of telemarketing, left unchecked, would undermine that custom. "Unwanted calls are tainting the wanted ones and make us cringe at the thought of answering the telephone at night. . . .[I]t's a classic case of the bad apples spoiling the whole barrel." 137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper); 137 Cong. Rec. H11,310 (daily ed. Nov. 26, 1991) (statement of Rep. Markey) (TCPA intended to protect privacy "before our home telephones become the receptacles of junk calls in the same way that junk mail often inundates our mailboxes"). The situation has greatly worsened since the TCPA was first passed. Unless the situation improves, Americans will permanently acclimate to the telephone call as a fundamentally untrustworthy medium for free speech and stop answering unidentified telephone calls, frustrating the legislative intent behind the TCPA.

**Defendants' Illegal Telemarketing Calls**

16. InVida is a Field Marketing Organization ("FMO") or Independent Marketing Organization ("IMO") which markets insurance products (including final expense insurance and other insurance policies) of insurers which include (on information and belief) American-Amicable Life Insurance Company of Texas, Americo, Ameritas Life Insurance Corp., Assurant, Athene, Columbian Financial Group, Foresters Financial, Global Atlantic Financial Group, GPM Life , Mutual of Omaha, and National Life Group.

17. InVida markets these products through its network of insurance agents. Brylorence is a part of InVida's network, and operates as an insurance (sub)agent or subordinate insurance agency—a "downlink" independent contractor selling insurance products under

InVida's umbrella. On information and belief, InVida provides "[e]xtensive training and mentoring" to its network of subagents: "We have an unparalleled mentor-ship program and offer independent work, support, and the potential to earn large amounts of income through our grade A financial products."

18. On information and belief, Defendants derive income from the compensation insurers pay to InVida for selling their insurance products in the form of a commission. In turn, InVida passes on a portion of that commission to Brylorence and its other agents.

19. Part of InVida's business model is to provide leads (that is, the contact information for prospective customers—to its network of subagents. On information and belief, InVida offers leads to agents selling its mortgage and final expense products under several different programs. On information and belief, Brylorence obtained Bland's telephone number from InVida or one of the lead generators used by InVida.

20. On information and belief, InVida has described its network of subagents this way: "Agents/underwriters take lead responses, call clients to set an appointment, then sit down with them in their home for about an hour to help them pick out the best [insurance product] that fits their budget."

21. InVida maintains tight control over Brylorence's marketing. On information and belief, InVida approved all of Brylorence's marketing materials and social media postings which reference InVida. Brylorence's marketing materials and email signatures include logos for both Brylorence and InVida next to each other. Brylorence's website also displays a "Powered by InVida" graphic. On information and belief, InVida prohibited Brylorence from "us[ing] an automatic telephone dialing system of their own findings relative to the operation of their lnVida" unless Brylorence honored consumers' "opt out" requests.

22. InVida maintains significant control over Brylorence in other ways. On information and belief, InVida maintains the right to

- control Brylorence's use and access to any "proprietary" information it received from InVida,
- replace Brylorence's personnel, and
- recover any compensation Brylorence received from policies in which the premiums have been returned or in which the policy or compensation InVida received that is subject to recapture.

On information and belief, InVida required Brylorence to limit access to personal information "about individuals who seek to obtain or obtain insurance products and/or services" from Brylorence except as permitted under the Gramm-Leach-Bliley Act and related federal and/or state law.

23. Defendants promote InVida's insurance products through aggressive, illegal outbound telemarketing campaigns. Defendants hire and use telemarketers (including "Great Quote Insurance") to solicit consumers in Texas.

24. Defendants' telemarketing campaigns are conducted for Defendants' benefit and on their behalf. Defendants' telemarketers initiate telemarketing calls from offshore call centers to telephone numbers on the Do-Not-Call registry, assess the recipient's need and/or interest in InVida's insurance products, then connect or transfer the recipients to an onshore call center operated by Brylorence and its employees.

25. Brylorence is InVida's licensed agent, and uses InVida's name, logo, and connections with insurers subject to InVida's specific approval.

26. InVida has a clear financial incentive to directly solicit its leads, by itself, so it would not have to share its commission. (On information and belief, InVida does in fact market to some of its own leads directly, and directly employs its own lead generators to do so.) InVida

would solicit these leads directly if it were legal to do so. Instead, InVida provides leads to its subagents as a deliberate strategy to minimize its legal liability for marketing to these leads (including via telemarketing).

27. Defendants ratify these telemarketing campaigns. On information and belief, InVida continues to provide leads like Bland to its subagents, and to share commissions with Brylorence and its other subagents, despite ignoring clear signs that the sales generated from these leads were illegal. On information and belief, InVida has ignored multiple complaints about illegal telemarketing from leads like Bland. Defendants ratify their telemarketers' conduct by accepting commissions on sales they know were generated by illegal telemarketing (or are willfully blind to the same), and paying InVida's lead generators and telemarketers. On information and belief, InVida had continued to provide leads like Bland to its subagents, and to share commissions with Brylorence, despite being aware of Bland's own complaints from 2022. Defendants have knowingly and actively accepted money generated by illegal telemarketing calls, and paid and/or approved payment of commissions to telemarketers for such calls.

28. Defendants and their telemarketers systemically fail to honor the national Do Not Call List. Defendants do not have express consent to call telephone users whose telephone number is on the Do Not Call List.

29. Defendants and their telemarketers also use misleading or inaccurate caller identification information, including "spoofed" telephone numbers (that is, replacing the actual originating number displayed to recipients caller ID systems—which could be used to reliably identify the vendors' calls—with a falsified ostensible outgoing telephone number) to entice recipients to answer their telephone calls. This spoofing means call recipients are only able to avoid Defendants' unwanted calls by risking that they miss wanted calls. If Defendants'

telemarketers did not spoof their calls, they would incur too much liability for their business to be profitable.

30. Nonetheless, Defendants and their telemarketers made, and continue to make, these telemarketing calls to individuals nationwide without their consent.

31. Defendants operate, manage, monitor, and/or control these telemarketing campaigns through InVida's customer relationship database(s) and the information collected from calls that are transferred to InVida's onshore call center(s), and from subsequent communications with leads.

32. Defendants are legally responsible for ensuring they and/or their third-party telemarketers complied with the TCPA, even if they did not make the calls themselves. Defendants are vicariously liable for their telemarketers' TCPA violations. There is no material distinction between telemarketing calls made by Defendants and/or by call centers who are technically third parties.

33. On information and belief, Defendants and the telemarketers used for the telemarketing campaigns alleged in this complaint were and are at all relevant times Defendants' actual agents, ostensible agents, conspirators, partners, alter egos, joint venturers, and/or employees, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of Defendants.

**Plaintiff's Individual Allegations**

34. **Bland's DNC Number:** Bland's telephone number—(817) XXX-2161—has been registered with the National Do-Not-Call Registry for over ten years. Bland uses this telephone number for personal, family, and household purposes: this is her residential number.

35. **Defendants' Summer 2022 Telemarketing Campaign:** Bland a series of telemarketing calls to her (817) XXX-2161 telephone number from Defendants' telemarketers on August 25 (from 240-837-6403), September 27 (817-203-9951 and 817-900-0707), and September 28, 2022 (from 817-901-5753). All of the callers used the same or similar tradenames ("US Life" and "US Care") and sought to sell InVida's products, including final expense insurance, and had the same distinctive accent and syntax. Bland lived in Irving, Dallas County during the time of these calls.

36. Based on the commonality of the calls (i.e. the phone number, the language, the syntax, the insurance products being promoted, etc.) the only reasonable inference is that those calls came from the same source. Bland had not received any other calls regarding final expense insurance during this time period.

37. During the first three calls, Bland told these callers that she was not interested, and to stop calling. After Bland interrupted him, the caller during the second call became abusive, and told her to "shut the fuck up and let me talk, bitch."

38. **Defendants' Last Call:** Bland had told Defendants' telemarketers to stop calling, and they did not. By the last call on September 28, 2022, Bland determined she could not stop Defendants' telemarketers from calling her unless she identified Defendants and documented her claims against them. So Bland told the caller she might be willing to purchase final expense insurance but she needed more information about the Defendants.

39. **The Transfer:** The caller told Bland he would transfer her to a licensed insurance agent, but told her that if her telephone number was registered in any federal or state Do Not Call list, the transfer would not connect, and asked her if she understood. These statements establish that Defendants' telemarketers knew their telemarketing operations were unlawful. After the

caller asked some questions to qualify Bland for final expense insurance, he transferred her to a "verifier" and identified himself as "Sandy Cooper" to the verifier.

40. The verifier identified himself as Joseph Caesar, a "Brylorence InVida" employee, and asked Bland additional qualification questions. Bland ended the call after the employee began to ask questions about her banking accounts.

41. Afterwards, in response to Bland's written complaint, Brylorence claimed that the call was transferred from a "lead generator" called "Great Quote Insurance" in "an attempt to gain [its] business" selling "lead generated call services." Conversely, Brylorence also claimed it "was under the impression that [Bland] willfully contacted Great Quote Insurance," evidencing that Brylorence and "Great Quote Insurance" in fact had a relationship prior to the call. On information and belief, InVida procured leads for Brylorence from "Great Quote Insurance."

42. **Defendants' Telemarketing Scheme:** On information and belief, Defendants and their telemarketers (including "Great Quote Insurance") participated in a common scheme and/or used a common script developed to help InVida qualify leads.

43. Under their scheme, Defendants' telemarketers did not identify or transfer leads to InVida until after they were qualified, which included questions that were intended (but failed) to mitigate liability under the TCPA. On information and belief, Defendants train their telemarketers and lead generators to qualify the leads without identifying themselves or Defendants, so that most leads are never qualified or transferred to Brylorence (or InVida's other subagents), and so are never in a position to identify the Defendants. Without the scheme, Defendants would incur too much liability for their telemarketing campaigns to be profitable.

44. The purpose of Defendants' scheme is to generate as many sales via unlawful telemarketing campaigns as possible, in a manner that evades or minimizes their legal liability

for those campaigns. The scheme involves various precautions and measures taken by Defendants and their telemarketers to avoid identifying Defendants before they are transferred.

45. To the extent Defendants' written documents (like their contracts, policies, and email) state that their telemarketers were not to violate the TCPA, that is only an effort to provide Defendants plausible deniability and does not reflect Defendants' actual intent or agreement. In fact, the scheme alleged herein reflected the unwritten terms of Defendants' real, operative agreement—even when it contradicts Defendants' written documents.

46. Defendants' telemarketers use false names ("Sandy Cooper"), trade names ("US Life" and "US Care"), and spoofed telephone numbers. Defendants use this false information to attribute particular leads and/or calls to specific telemarketers or telemarketing campaigns. These trade names and spoofed telephone numbers are generic, confusingly similar, and/or entirely anonymous and make it difficult for consumers to identify Defendants.

47. **Intended Effects of Defendants' Scheme:** Defendants knew their telemarketing campaign would cause and intended to cause the loss of use of recipients' telephones, wasted time, invasion of privacy, and the diversion of recipients' attention away from their daily activities inherent in Defendants' unsolicited, harassing, and deceptive telemarketing campaigns.

48. Defendants knew and intended for their scheme to make it difficult for Leads to avoid or otherwise respond to Defendants' calls (for instance, asking to be placed on Defendants' internal Do Not Call list). These practices also make it difficult for call recipients to avoid or otherwise respond to Defendants' calls (for instance, asking to be placed on Defendants' internal Do Not Call list). Call recipients are only able to avoid Defendants' unwanted calls if they risk missing potentially wanted calls, and cannot identify which companies they have instructed not to call them.

## Class Action Allegations

49. **DNC Class Definition:** Plaintiff brings this Complaint against Defendants, pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and the following Class (the "DNC Class"):

> All persons in the United States who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

Excluded from the DNC Class are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' owners, affiliates, agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded are the judge and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiff reserves the right to revise and amend this class definition based on facts learned during discovery.

50. **Texas Class Definition:** Plaintiff also brings this Complaint against Defendants, pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and the following Class (the "Texas Class"):

> All persons who received a telemarketing call by or on behalf of Defendants while the person were resided in Texas and while Defendants lacked a registration certificate for the business location from which such telephone call was made, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

Excluded from the Texas Class are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' owners, affiliates, agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded are the judge and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiff reserves the right to revise and amend this class definition based on facts learned during

discovery.

51. **Numerosity:** The exact number of members of the Classes is unknown and is not available to Plaintiff at this time, but such information is readily ascertainable by Defendants and their agents' records. The Classes are so numerous that joinder of all members is impractical. Plaintiff alleges that there are at least forty members of each Class.

52. **Commonality:** Plaintiff and the members of the Classes share common experiences receiving calls by or on behalf of Defendants. They received multiple, incessant, uninvited calls for the purposes of marketing the services of Clients to their residential telephone numbers.

53. **Predominance:** In addition, common questions of fact and law exist as to all Class members and predominate over the questions affecting only individual members of the Classes. Identification of the individuals who qualify as a member of a Class will be sufficient to establish liability to the class member. The predominant common questions include:

a. Whether Defendants and/or their agents made telephone calls to members of the DNC Class whose telephone numbers were registered with the national Do-Not-Call registry, and/or instituted and maintained procedures and minimum standards prescribed by 47 C.F.R. § 64.1200(d) for making telemarketing calls;

b. Whether Defendants are vicariously liable for any calls by their agents and/or sub-agents;

c. Whether the phone calls constitute "solicitations" as defined by 47 U.S.C. § 227(a)(4);

d. Whether violations were willful or negligent;

e. Whether Defendants and/or their agents had legally effective consent to place telemarketing calls to Plaintiff and Class members;

f. Whether Defendants registered the offices from which their telephone solicitations are made Tex. Bus. & Com. Code § 302.101;

g. Whether Plaintiff and Class members are entitled to damages, including whether Defendants' violations were performed willfully or knowingly such that Plaintiff and Class members are entitled to treble damages;

h. Whether Plaintiff and Class members are entitled to injunctive relief and attorneys' fees and costs.

54. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes. Plaintiff is not different in any relevant way from any other members of the Classes, and the relief they seek is common to the Classes.

55. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes: Plaintiff's interests do not conflict with the interests of the other Class members. Plaintiff has retained counsel competent and experienced in complex class actions, including class actions arising under the TCPA and other consumer protection laws, and they intend to prosecute this action vigorously.

56. **Predominance and Superiority:** The Classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for Class members to individually obtain effective relief from Defendants' misconduct. Even if Class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort,

and expense will be fostered and uniformity of decisions will be ensured.

57. **Generally Applicable Policies:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each class a whole. The policies of the Defendants challenged herein apply and affect members of each class uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiff.

58. **Injunctive Relief is Appropriate:** Based on information and belief, Defendants continue to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Defendants' conduct and to prevent irreparable harm to Plaintiff and the members of the Classes for which they have no adequate remedy at law.

## FIRST CAUSE OF ACTION
## (Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(c) Against All Defendants By Plaintiff, Individually, and on Behalf of the DNC Class)

59. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

60. Defendants are "persons" as defined by 47 U.S.C. § 153(39).

61. The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). Where "the court finds that the Defendants willfully or knowingly violated the regulations prescribed under this subsection," it "may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount [otherwise] available . . ." *Id.*

62. The FCC's TCPA regulation provides that "[n]o person or entity shall initiate any telephone solicitation" to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). This prohibition also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

63. On information and belief, Defendants and/or their agents routinely make outgoing calls to residential and cellular telephones in the regular course of their telemarketing campaigns alleged above. Defendants violated 47 C.F.R. § 64.1200(c) by initiating telephone solicitations to wireless and wireline residential telephone subscribers such as Plaintiff and the other DNC Class members.

64. Defendants' violations are willful because Defendants knew that Plaintiff and DNC Class members had not given prior express consent to receive telemarketing calls made to telephone numbers placed on the Do Not Call List and that Defendants called such telephone numbers, or benefitted from calls on their behalf. Because Defendants' violations were willful, the Court should treble the amount of statutory damages recoverable by Plaintiff and the other Class members.

65. Plaintiff Kelly Bland, on her own behalf, and on behalf of the other the DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

**SECOND CAUSE OF ACTION**
**(Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(d)**
**Against All Defendants By Plaintiff, Individually, and on Behalf of the DNC Class)**

66. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

67. The FCC's TCPA regulation also provides that

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made [and] must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. . . .
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

47 C.F.R. § 64.1200(d). Again, this prohibition also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

68. On information and belief, Defendants and/or their agents violated 47 C.F.R. § 64.1200(d)(2) and/or (3) by making telephone calls for telemarketing purposes because their

telemarketers did not record and honor do-not-call requests, and/or were not trained to do so. Defendants' violations are willful because Defendants knew (or deliberately and willfully avoided knowing) that the TCPA prohibited their telemarketers' conduct. Because Defendants' violations were willful, the Court should treble the amount of statutory damages.

69. On information and belief, Defendants and/or their agents violated 47 C.F.R. § 64.1200(d)(4) by making telephone calls for telemarketing purposes which actively concealed the name of the individual caller, Defendants' name, and a telephone number or address at which Defendants could be contacted. Specifically, Defendants and/or their agents use deceptive and misleading scripts which fail to identify Defendants until after the telemarketer transfers the call. Defendants engaged in the scheme alleged above (including using spoofed numbers) in order to avoid liability for illicit telemarketing. Because Defendants' violations were willful, the Court should treble the amount of statutory damages.

70. Plaintiff Kelly Bland, on her own behalf, and on behalf of the other the DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

## THIRD CAUSE OF ACTION
## (Violation of Tex. Bus. & Com. Code § 305.053 Against All Defendants By Plaintiff, Individually, and on Behalf of the Texas Class)

71. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72. As alleged in Counts One and Two, Bland alleges Defendants' calls violated various provisions of "47 U.S.C. Section 227" and "a regulation adopted under" 47 U.S.C. § 227. Tex. Bus. & Comm. Code § 305.053(a). These TCPA violations also permit Bland and the Texas

Class members to seek additional remedies under Texas state law. Tex. Bus. & Comm. Code § 305.053.

73. Texas law authorizes statutory damages of $500 for each violation, or $1,500 for each violation, if the "court finds that the defendant committed the violation knowingly or intentionally." Tex. Bus. & Comm. Code § 305.053(b), (c). As alleged in Counts One and Two, Defendants' violations are willful, and the Court should treble the amount of statutory damages recoverable by the Plaintiffs and the Texas Class members.

74. Plaintiff Kelly Bland, on her own behalf, and on behalf of the other the Texas Class members, seeks to recover statutory damages (including treble damages for willful violations), as well as injunctive and equitable relief under Tex. Bus. & Comm. Code § 305.053(b), (c) against Defendants.

**FOURTH CAUSE OF ACTION**
**(Violation of Tex. Bus. & Com. Code § 302.101 Against All Defendants By Plaintiff, Individually, and on Behalf of the Texas Class)**

75. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

76. Defendants' insurance products are an "item" under the Texas telephone solicitation law. *Cf.* Tex. Bus. & Com. Code § 302.001(1) ("'Item' means property or a service").

77. Bland and the Texas Class members are "purchasers." *Cf.* Tex. Bus. & Com. Code § 302.001(3) (including "person who [] is offered an opportunity to [] receive an item").

78. The calls to Bland and the Texas Class members alleged above in Counts One, Two, and Three are "telephone solicitations." *Cf.* Tex. Bus. & Com. Code § 302.001(7) ("a telephone call a seller or salesperson initiates to induce a person to purchase [] or receive an

item”).

79. Defendants are “sellers” under the Texas telephone solicitation law. Cf. Tex. Bus. & Com. Code § 302.001(5) (“a person who makes a telephone solicitation”).

80. The Texas telephone solicitation law requires sellers to register the offices from which telephone solicitations are made.

> A seller may not make a telephone solicitation from a location in this state or to a purchaser located in this state unless the seller holds a registration certificate for the business location from which the telephone solicitation is made.

Tex. Bus. & Com. Code § 302.101.

81. Defendants’ violations of the Texas telephone solicitation law render them “subject to a civil penalty of not more than $5,000 for each violation,” and liable for “all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney’s fees.” Tex. Bus. & Com. Code § 302.302(a), (d).

82. Plaintiff Kelly Bland, on her own behalf, and on behalf of the other the Texas Class members, seeks to recover civil penalties, as well as all reasonable costs under Tex. Bus. & Com. Code § 302.302(d) against Defendants.

**WHEREFORE,** Plaintiff Kelly Bland prays that the Court enter judgment and orders in Plaintiff’s favor and against Defendants InVida Financial Network LLC and Brylorence Investments, LLC as follows:

a. An order certifying the Classes, directing that this case proceed as a class action, and appointing Plaintiff and her counsel to represent the Classes;

b. Statutory damages as provided under 47 U.S.C. § 227(c)(5) and under against Defendants in favor of Plaintiff and the DNC Class, including trebled damages for willful and knowing violations;

c. Statutory damages as provided under Tex. Bus. & Comm. Code §

305.053(b), (c) against Defendants in favor of Plaintiff and the Texas Class, including trebled damages for willful and knowing violations;

d. Civil penalties as provided under Tex. Bus. & Com. Code § 302.302;

e. Injunctive relief under 47 U.S.C. § 227(b)(3), Tex. Bus. & Comm. Code § 305.053(a)(1), and Tex. Bus. & Com. Code § 302.301 against Defendants in favor of Plaintiff and the DNC and Texas Classes;

f. All reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees for the Texas Class;

g. Such other and further relief as this Court may deem appropriate.

Dated: February 10, 2026

By: s/Ethan Preston

Ethan Preston (24091084)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Plaintiff Kelly Bland, on her own behalf, and behalf of all others similarly situated*

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: February 10, 2026

By: s/Ethan Preston

Ethan Preston (24091084)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Plaintiff Kelly Bland, on her own behalf, and behalf of all others similarly situated*